1

2

3

4

5

6

7           UNITED STATES DISTRICT COURT

8         NORTHERN DISTRICT OF CALIFORNIA

9

10   CENTURY 21 REAL ESTATE,              No. C 06-7809 WDB
     LLC.,
11                                        ***ORDER FOR REASSIGNMENT*** AND
                  Plaintiff,              **REPORT AND**
12                                        **RECOMMENDATION RE**
            v.                            **APPLICATION FOR DEFAULT**
13                                        **JUDGMENT**
     HERITAGE REAL ESTATE, INC.,
14   et al.

15                Defendants.
     _____/
16

17        Plaintiff Century 21 Real Estate LLC is a limited liability company and a

18   licensed real estate broker.  Complaint, filed December 20, 2006, at 1 and Ex. A.

19   Defendant Heritage Real Estate, Inc., ("Heritage") is a corporation that, at one

20   time, operated multiple Century 21 real estate brokerage franchises.  *Id*.  The

21   relationship between the parties was memorialized by four separate franchise

22   agreements as well as by various promissory notes and security agreements.

23   Complaint at Ex. A-D and K-T.

24        On December 20, 2006, plaintiff filed a complaint against Heritage seeking

25   damages for breach of contract and various other claims.[1]  Plaintiff alleges that

26

27        [1]Plaintiff also sues three individual defendants.  However, each of the individual
     defendants has filed for bankruptcy, and this action has been stayed as to these defendants
28   pending resolution of the bankruptcy actions.

                                    1

Heritage breached the franchise agreements and defaulted on the loans memorialized by each of the promissory notes.  See, Complaint.

Plaintiff also asks the Court to compel defendant to comply with an audit as required under the franchise agreements and to award plaintiff possession of personal property secured by the security agreements.  Complaint at 14.

Plaintiff served defendant Heritage with a copy of the Complaint on December 30, 2006.  See, Declaration of Gary J. Lorch in Support of Plaintiff's Application for Entry of Judgement, filed April 18, 2007 ("Lorch Decl."), at Ex. AA.

In response to plaintiff's application for entry of default, the Clerk of the Court entered default as to Heritage Real Estate, Inc., on February 5, 2007.

On April 18, 2007, plaintiff filed its Application for Entry of Default Judgment by Court Against Defendant Heritage Real Estate, Inc., ("Application"). However,  plaintiff did not serve its Application on Heritage until May 15, 2007. Proof of Service, filed May 18, 2007.

On May 7, 2007, the Court issued an order for supplemental submissions from plaintiff with respect to several matters.  Plaintiff filed its supplemental submissions on May 21, 2007.

On June 27, 2007, the Court conducted a hearing in connection with plaintiff's Application.  No appearance was made on behalf of defendant Heritage.

In its Application plaintiff seeks judgment against defendant Heritage in the amount $6,998,826.80 to recover royalty fees, so-called National Advertising Fund ("NAF") fees, "stipulated damages," and loan principal.  Plaintiff also seeks prejudgment interest in the amount $346.77 per day from August 30, 2006, through the date of judgment and attorneys' fees and costs in the amount $31,457.50. Declaration of Debbie Iuliano in Support of Application for Entry of Judgment, filed April 18, 2007, ("Iuliano Decl."), at ¶¶17-18, 29-30, 41-42, 53-54 and Ex. J,

2

O, U, and Z; Lorch Decl., at ¶¶8, 10, 12 and Declaration of Gary J. Lorch, filed May 21, 2007, ("Supp. Lorch Decl."), at ¶¶5-9.  Additionally, plaintiff requests an order compelling defendant Heritage to submit to an audit of its records, to pay all additional amounts deemed owing by the auditor, and to turn over all personal property secured by the parties' Security Agreements.  Iuliano Decl., at ¶¶14, 26, 38, 50 and Ex. H, M, S, X; Application at 6 and 18.

Because defendant Heritage has not appeared in this action, this Court has not secured consent as required by 28 U.S.C. §636(c).  Accordingly, we make the following Report and Recommendation and ORDER the Clerk of the Court to randomly reassign this action to a District Judge.

## I.    **Entitlement to Entry of Default Judgment**

Plaintiff seeks entry of judgment by default against the entity Heritage Real Estate, Inc.

Plaintiff served defendant Heritage with its motion for default judgment.  See, Proof of Service, filed on May 18, 2007.

Heritage has failed to respond to the Complaint or otherwise to appear in the proceedings, and the Clerk of the Court entered default as to this defendant.

Heritage's agent for service of process is John Schlendorf, one of the individual defendants who has appeared in this matter through counsel.  Mr. Schlendorf clearly is aware of the action, yet the corporate entity still has chosen not to appear.  In our view, this fact demonstrates Heritage's choice not to defend this action and strongly supports plaintiff's request for judgment by default.  Given defendant Heritage's complete failure to appear and the significant risk of prejudice to plaintiff resulting from the alleged breach, the sufficiency of plaintiff's complaint, and the apparent merit of plaintiff's substantive claims, we RECOMMEND that the District Judge to whom this case is reassigned find that

plaintiff is entitled to judgment by default against Heritage Real Estate, Inc.  See, F.R.C.P. 55(b); *Eitel v. McCool*, 782 F.2d 1470 (9th Cir. 1986).

## II.    Specific Items of Relief Sought by Plaintiff

Plaintiff operates as a "real estate agent franchise company."  Iuliano Decl., at ¶3.  Defendant entered four franchise agreements with plaintiff to establish "Century 21 Heritage Real Estate" offices in four specified locations.  On September 1, 2000, the parties contracted to establish Century 21 franchises that would be operated by defendant Heritage in Lafayette, California and Danville, California ("First Franchise Agreement" and "Second Franchise Agreement").  Iuliano Decl., at Ex. C and K.  On April 1, 2001, the parties contracted to establish a Century 21 franchise in Oakland, California ("Third Franchise Agreement").  Iuliano Decl., at Ex. P.  Finally, a contract dated July 1, 2001, established a Century 21 franchise in Livermore, California ("Fourth Franchise Agreement").  Iuliano Decl., at Ex. V.[2]  Pursuant to the parties' choice of law provisions, each of the Franchise Agreements is governed by the laws of the state of New Jersey.

In connection with each of the four Franchise Agreements plaintiff agreed to loan money to defendant Heritage in order to assist with establishing each real estate office.  These loans are memorialized by a series of promissory notes.  With respect to the First Franchise Agreement, plaintiff loaned defendant a total of $547,000.00.  The terms of these loans are encompassed in three "Development Advance Promissory Notes" and one "Expansion Promissory Note."  Iuliano Decl., at ¶10 and Ex. D, E, F, and G.  With respect to the Second, Third and Fourth Franchise Agreements plaintiff loaned defendant $160,000.00, $260,000.00, and $85,000.00 respectively.  The terms of these loans are memorialized by four

---

[2]The First, Second, Third, and Fourth Franchise Agreements are substantially the same, and we refer to them collectively as "the Franchise Agreements."

"Development Advance Promissory Notes."[3]  Iuliano Decl., at ¶¶23, 35, and 47 and Ex. L, Q, R, and W.[4]  Each of the Promissory Notes at issue provides that, upon default, plaintiff may declare the full amount of the loan due.  *E.g.*, Iuliano Decl., at Ex. D.  The Promissory Notes, like the Franchise Agreements, are governed by New Jersey law.

Additionally, defendant agreed to mortgage various personal property to secure its debts to plaintiff.  The parties executed multiple "Security Agreements" which purport to provide plaintiff a security interest:

> in all of the furniture, furnishings, equipment, real estate listings and listing agreements and related rights which are located at or related to [defendant's Century 21 real estate businesses] and including the proceeds and products therefrom and any and all substitutions, replacements, additions and accessions thereto and to CENTURY 21 Incentive Bonuses to which debtor may be entitled pursuant to any franchise agreement entered into with Secured Party, together with all such rights and property hereafter acquired by Debtor.

Iuliano Decl., at ¶¶ 14, 26, 38, 50 and Ex. H, M, S and X.  Each Security Agreement pertains to a specific Franchise Agreement and to specified loans.  *Id*. Defendant's default on any of the specified contracts entitles plaintiff to enforce the related Security Agreement.[5]  The Security Agreements are governed by <u>California</u> law.  *Id*.

---

[3]The Second and Fourth Franchise Agreement relate to one promissory note each.  The Third Franchise Agreement relates to <u>two</u> Development Advance Promissory Notes -- one for $200,000.00 and one for $60,000.000.  Iuliano Decl., at Ex., Q and R.

[4]We refer to all of the loan documents collectively as "the Promissory Notes."

[5]Each Security Agreement actually purports to be security for the specified loans, the specified Franchise Agreements "and all other agreements between debtor and secured party." Because we find that plaintiff has proffered a Security Agreement securing each Promissory Note and each Franchise Agreement in evidence in this action, we need not determine the import of the parties' "catch-all" reference to "any other agreements."  See, section II.D., *infra*. However, as stated on the record, the court would be disinclined to recommend that such broad language be enforced.  See, Transcript June 27, 2007, hearing.

Plaintiff alleges that defendant Heritage has breached its Franchise Agreements by (1) ceasing operations and abandoning the franchises,[6] and (2) failing to pay royalty fees and NAF fees owed pursuant to the terms of those agreements. Iuliano Decl., at ¶¶15, 17, 27, 29, 39, 41, 51, 53. Plaintiff also alleges that defendant has failed to make scheduled payments under all of the Promissory Notes and, therefore, is in default on those agreements. *Id.* By failing to respond to plaintiff's Complaint, defendant has conceded that plaintiff's well-pled allegations are true and thus admits that it has breached the Franchise Agreements as well as each of the Promissory Notes.

As a result of defendant's failure to fulfill its contractual obligations, plaintiff notified defendant that it was in breach of the various agreements and that plaintiff was exercising its option to terminate the Franchise Agreements and its option to declare the full amounts under those agreements and under the Promissory Notes due and owing. Iuliano Decl., at ¶¶16, 28, 40, and 52 and Ex. I, N, T and Y.

Because plaintiff is deemed to have established that defendant was bound by and has breached the Franchise agreements and Promissory Notes, we now determine the amount of damages owing under the various contracts and consider plaintiff's requests that we compel defendant to submit to an audit and to turn over all collateral secured by the Security Agreements.

### A. Damages under the Franchise Agreements

Plaintiff seeks five categories of damages pursuant to the Franchise Agreements: royalty fees, NAF fees, stipulated damages, prejudgment interest, and attorneys' fees and costs. Because plaintiff also is entitled to attorneys' fees and costs pursuant to the Promissory Notes, we will address plaintiff's request for

---

[6]The Franchise Agreements permit plaintiff to terminate the contract in the event that defendant's office "shall have become vacant, abandoned or deserted, or shall fail to remain open for business as required." *E.g.*, Iuliano Decl., Ex. C. at ¶17.H.

attorneys' fees and costs separately in section II.C. below. We consider each of the remaining categories of damages in the following paragraphs.

### 1.    Royalty Fees and NAF Fees

Under each Franchise Agreement defendant Heritage agreed to pay plaintiff a "royalty fee" "equal to six percent (6%) of the gross revenue earned, derived and/or received by [defendant] . . . during the term of this Agreement from [an enumerated list of revenue sources]." *E.g.*, Iuliano Decl., Ex. C at ¶8.A. Under certain circumstances, the Franchise Agreements also provide for a minimum royalty fee of $500.00 per month. *E.g.,* Iuliano Decl., Ex. C at ¶8.C. Plaintiff has presented evidence, uncontradicted by virtue of defendant's default, that would support a finding that the outstanding amount of royalty fees owed under all of the Franchise Agreements totals $134,180.32. Iuliano Decl., at ¶¶17, 29, 41, 53 and Ex. J, O, U, and Z.

In addition to "royalty fees," defendant agreed to pay "a National Advertising Fund . . . contribution equal to two percent (2%) of [defendant's] gross revenue" subject to specified minimum and maximum monthly contributions. *E.g.,* Iuliano Decl., Ex. C at ¶9.A. Plaintiff has presented evidence, uncontradicted by defendant, that would support a finding that the outstanding amount of "NAF" fees owed under all of the Franchise Agreements totals $29,364.59. Iuliano Decl., at ¶¶17, 29, 41, 53 and Ex. J, O, U, and Z.

Accordingly, we RECOMMEND that the District Judge to whom this case is reassigned enter a judgment for plaintiff and against defendant Heritage that includes damages for "royalty" and "NAF" fees totaling $163,544.91.

//

//

//

7

## 2. **Stipulated Damages**

In the event that the Franchise Agreements are terminated early the parties provided an "additional remedy" designed to compensate plaintiff for "lost future profits." *E.g.,* Iuliano Decl., Ex. C at ¶19. Provisions of this type refer to "stipulated damages." Under New Jersey law, provisions for stipulated damages are enforceable as "liquidated damages" designed to compensate plaintiff where they are "reasonable under the totality of the circumstances." *Metlife Capital Financial Corp., v. Washington Avenue Assoc., L.P.,* 159 N.J. 484, 732 A.2d 493 (N.J. S.Ct. 1999). When such provisions are unreasonable they constitute a "penalty" designed to punish the defendant and/or to deter breaches of contract and are unenforceable.

Under the terms of the parties' agreements the stipulated damages are calculated by multiplying the average monthly royalty fee contribution and the average monthly NAF fee contribution between the commencement of the contract and the date of early termination by the number of months remaining between the date of early termination and the end of the contract. *E.g.*, Iuliano Decl., ¶¶18, 30, 42, 54 and Ex. C at ¶19. This amount is then discounted by the rate of 8% to obtain the present value of the damages due. *Id.*

New Jersey courts have set forth the kinds of factors normally considered to determine reasonableness. *E.g., Metlife*, 732 A.2d at 499. We do not discuss those factors here, however, because, under the law established in New Jersey, "liquidated damages provisions in a commercial contract between sophisticated parties are presumptively reasonable and the party challenging the clause bears the burden of proving its unreasonableness." *Metlife*, 732 A.2d at 499 (emphasis added). The contracts at issue in this case are commercial contracts between experienced commercial players. Iuliano Decl., at Ex. A (California Secretary of State records indicating that defendant has been an incorporated business since

8

1971).  Accordingly, we *presume* that the stipulated damages provisions to which the parties agreed are reasonable unless defendant Heritage proves they are unreasonable.  Heritage has chosen not to appear in this action and, thus, has not challenged the reasonableness of these provisions.[7]  Therefore, we RECOMMEND that the District Court to whom this case is reassigned find that the parties' stipulated damages provisions constitute enforceable liquidated damages and not penalties.

        Plaintiff has proffered evidence that would support a finding that, under the parties' stipulated damages provisions, defendant owes an additional $6,252,495.00.  Iuliano Decl., at ¶¶18, 30, 42, and 54.  Accordingly, we RECOMMEND that the District Court to whom this case is reassigned enter a judgment for plaintiff and against defendant Heritage that includes liquidated damages in the amount $6,252,495.00.

//

//

---

[7]At the June 27th hearing, the court queried plaintiff's counsel about whether the requested stipulated damages should be offset by an amount equal to 10% of the presumed royalty fees for the post-termination period to reflect monies that, had the contract not been terminated, plaintiff might have been obligated to pay into the NAF from its own funds.  *E.g.,* Iuliano Decl., Ex. C. at 6.F.  We wondered whether the parties' stipulated damages provision created a small windfall to plaintiff who, presumably, would no longer be paying the 10% figure into the NAF on defendant's behalf. See, Transcript, June 27, 2007, hearing.  *See, Wasserman's Inc., v. Township of Middletown*, 137 N.J. 238, 645 A.2d 100 (1994) (expressing concern about potential for stipulated damages based on gross profits to create a windfall to plaintiff and therefore be unenforceable, and noting that net profits are a more reasonable assessment of actual losses). *Accord, Days Inn of America, Inc., v. P&N Enterprises, Inc.,* 164 F.Supp. 2d 255 (D. Conn. 2001) (New Jersey courts disfavor stipulated damages based on gross receipts as apposed to net profits); *A.V. Consultants, Inc. v, Barnes*, 978 F.2d 996 (7th Cir. 1992) (is penalty to pay fee for remainder of contract when no services are being rendered).
        We conclude that the stipulated damages should not be offset by this amount.  The stipulated damages provisions were negotiated by two sophisticated business entities who chose not to provide for any such offset.  Furthermore, as stated in the text, the stipulated damages provisions are *presumptively* reasonable, and the party challenging the clause bears the burden of proving its unreasonableness.  Because Heritage has not appeared in this action, it does not challenge the presumption that the negotiated stipulated damages are reasonable.  Moreover, plaintiff's obligation to contribute to the NAF appears to be contingent on Heritage performing under the agreements (*i.e.,* operating Century 21 real estate offices), and Heritage has not done so.

### 3.    Prejudgment Interest

The terms of the Franchise Agreements provide for interest on late royalty fees and late NAF fees "from the date due until paid at the lower rate of either the highest rate allowed by law or a rate that is five (5) percentage points per annum higher than the 'prime rate' then currently established by Mellon Bank, N.A. Pittsburg, PA."  Iuliano Decl., Ex. C at ¶¶8.B and 9.B.[8]

Generally, New Jersey courts have held that awards of prejudgment interest in contract actions are discretionary.  The courts will determine whether to award interest and the applicable rate as a matter of equity.  *E.g., DialAmerica Marketing, Inc., v. Keyspan Energy Corp.,* 374 N.J. Super. 502, 865 A.2d 728, 732 (Super. Ct. N.J. App. Div. 2005).  However, where the parties have provided for interest in the contract, we conclude that New Jersey courts will recognize the parties' right to do so and will apply the contract rate of interest.  *Accord, Capital One Bank v. Monge*, 380 N.J.Super. 266, 881 A.2d 814, 816 (N.J. Super. Law Div. 2005); N.J.S.A. 4:43-2(a); N.J.S.A. 6:6-3(a); N.J.S.A. 31:1-1.

---

[8]Plaintiff contends that a separate provision in the Franchise Agreements which provides for the rate of interest as to payments on "goods and services" also applies to late royalty fees and NAF fees.  Supp. Brief at n.2; *see*, Ex. C at 11.B(ii).  This provision uses an interest rate established by Wells Fargo Bank.
    Plaintiff has failed to persuade us that section 11.B(ii) applies to late royalty and NAF fees.  First, if section 11.B(ii) applied to late royalty and NAF fees, sections 8.B and 9.B would be superfluous.  Second, while both Mellon Bank and Wells Fargo now employ the same rate, if at some point in the contemplated life of the contracts this were not the case the contracts would be internally inconsistent.  Third, sections 8.B and 9.B, by their terms, apply to royalty and NAF fees.  In contrast, section 11.B(ii), by its terms, applies to payments due for "products, supplies, or services furnished by plaintiff."  Iuliano Decl., Ex. C (emphasis added).
    Nonetheless, as plaintiff points out, this issue is of little concern because, for our purposes, the rates of interest established by Mellon Bank and Wells Fargo currently are the same.

1    Plaintiff has presented evidence that the interest rate five percentage points

2    per annum above the prime rate that was established at the time of default by

3    Mellon Bank is 13.25%.[9]  Supp. Lorch Decl., at Ex. C and D.

4    Plaintiff's evidence supports a finding that prejudgment interest on the

5    known royalty and NAF fees accrues from August 30, 2006, through the date of

6    judgment at the rate of $59.37 per day.  Lorch Decl., at Ex. BB.

7    Accordingly, we RECOMMEND that the District Judge to whom this case is

8    reassigned enter a judgment in favor of plaintiff and against defendant Heritage

9    that includes prejudgment interest from August 30, 2006, through the date of

10   judgment in the amount $59.37 per day.

11

12    **4.    Request for Audit and Amounts Found Owing at the Audit**

13    Plaintiff requests that the Court enter judgment compelling defendant

14   Heritage to submit to an audit of its records for the period September 1, 2004,

15   through August 29, 2006, for the purpose of determining whether defendant has

16   accurately reported its gross revenue.[10]  Complaint at ¶¶46-49; Application at 2:3-

17   6; Transcript of June 27th hearing.

18    The governing Franchise Agreements obligate defendant Heritage to submit

19   to a reasonable audit of its records in order "to determine whether all revenue

20   received by [defendant] has been properly reported by [defendant], that appropriate

21

22    [9]We have identified no New Jersey authority that would suggest that this rate, on its face,
23   is legally vulnerable.  *Accord*, N.J.S.A. 31:1-6 (defense of civil usury unavailable to
      corporations); N.J.S.A. 2C:21-19(a) (under criminal usury statute any loan or forbearance made
24   to a corporation that is "not in excess of 50% per annum shall be a rate authorized or permitted
      by law").

25    [10]Evidence in the record supports a finding that plaintiff previously conducted an audit
26   that covered the period ending August 31, 2004.  Iuliano Decl., at Ex. J, O, U, and Z.
      Accordingly, the audit requested here will begin September 1, 2004.
27    The audit runs through the date that plaintiff terminated the contracts, August 29, 2006.
      Royalty and NAF fees relating to the period *after* August 29, 2006, are encompassed by the
28   stipulated damages calculation.

11

fees and contributions have been paid, and that the obligations of [defendant] under [the Franchise Agreement] have been complied with."  *E.g.*, Iuliano Decl., Ex. C at ¶11.C(iv).  As a result of defendant's refusal to submit to an audit, plaintiff has been unable to verify the full extent of defendant's obligations.  We find that plaintiff is entitled, by virtue of the Franchise Agreements, to conduct an audit of those records that are relevant to calculating defendant's gross revenues.

As stated on the record, it is this court's view that procedural due process requires that defendant be provided notice and opportunity to be heard with respect to the auditor's report.  Accordingly, we will recommend that the District Court order the requested audit on the condition that the auditor serve defendant Heritage with a draft of the auditor's report that clearly sets forth his or her  procedures and tentative judgments and provide Heritage with an opportunity to submit a response to the auditor within 30 days of being so served.  Additionally, if the auditor rejects input from defendant with respect to significant issues, the auditor must set forth in the final report an explanation of why s/he declined to follow defendant's views.

We RECOMMEND that the District Judge enter judgment compelling defendant to submit to an audit for the period September 1, 2004, through August 29, 2006, for the purpose of determining "whether all revenue received by [defendant] has been properly reported by [defendant], that appropriate fees and contributions have been paid, and that the obligations of [defendant] under [the Franchise Agreement] have been complied with" on the condition that defendant Heritage is provided with notice and an opportunity to have input about the auditor's report as outlined above.

Because plaintiff will provide defendant with an opportunity to present challenges to the accuracy of the audit, we RECOMMEND that the District Judge permit plaintiff to apply to the Court to amend the judgment to include all sums revealed as due and owing by the audit -- on the condition that defendant also is

given sufficient notice of the pendency of any <u>court</u> proceedings and a fair opportunity to challenge the accuracy of the audit before the District Judge.

### B.    Damages under the Promissory Notes

#### 1.    Principal

Plaintiff seeks additional damages for principal and interest relating to defendant's breach of the various Promissory Notes.

Plaintiff's Application sought outstanding principal under the Promissory Notes in the amount $582,786.89.  Iuliano Decl., at ¶¶17, 29, 41, 53 and Ex. J, O, U, and Z.

However, at the June 27th hearing, the court inquired about the discrepancy between Ms. Iuliano's representation of the principal amount of the Expansion Promissory Note ($111,242.56) and the principal amount stated on the face of that Note ($100,000.00).  Compare, Iuliano Decl., at ¶17 and Ex. G.  Plaintiff's counsel, on behalf of his client, represented that plaintiff would choose to withdraw its request for $11,242.56 rather than expend its resources researching the source of the discrepancy.  Accordingly, we find that plaintiff's evidence, uncontradicted by defendant, will support a finding that the remaining principal owed with respect to the Promissory Notes totals $571,544.33.

#### 2.    Interest

As we understand it, had defendant abided by the payment schedule set forth in the Development Advance Promissory Notes, plaintiff would not have been entitled to interest on the loaned sums.  However, in the event of default, these Promissory Notes each provide for "simple interest at a rate equal to the lesser of eighteen percent (18%) per annum or the highest rate allowed by law from its [the delinquent payment's] due date until paid in full."  *E.g.*, Iuliano Decl., at Ex. D.

Similarly, the Expansion Promissory Note provides for interest at the rate of five percent (5%) per annum if defendant is not in breach and provides for "simple interest at a rate equal to the lesser of eighteen percent (18%) per annum or the highest rate allowed by law from its [the delinquent payment's] due date until paid in full" if defendant is in default.  Iuliano Decl., at Ex. G.

Where, as here, a contract provides for a "default rate" of interest – an increased interest rate in the event of default, inapplicable if defendant performs under the contract – New Jersey courts will subject the default interest rate to a "stipulated damages" analysis.  *E.g., Stuchin v. Kasirer*, 237 N.J. Super. 604, 568 A.2d 907 (N.J.Super. App. Div. 1990).  As explained in section II.A.2, *supra*, stipulated damages provisions must be "reasonable" to be enforceable.  However, as also noted above, stipulated damages provisions between two commercial parties are presumptively reasonable.  The party challenging the provision has the burden to prove that the provision is <u>un</u>reasonable.  Defendant Heritage has not appeared in this action and, therefore, has not challenged the contracts' default interest provisions.  Accordingly, we apply the presumption that such provisions constitute reasonable, enforceable liquidated damages.

Plaintiff has presented evidence that the interest rate applicable to all the Promissory Notes in the event of default is eighteen percent (18%) per annum.[11] Plaintiff also has proffered evidence that the outstanding interest on the principal debt owing under the promissory notes accrues from August 30, 2006, through judgment at the rate of $281.86 per day.  Lorch Decl., at Ex. BB.[12]

---

[11]See, *supra*, note 9.

[12]Plaintiff originally sought interest on the outstanding Promissory Note principal at the rate of $287.40 per day.  Lorch Decl., at Ex. BB.  However, as stated above, plaintiff has withdrawn its request for $11,242.56 of principal.  This reduction reduces the accruing interest by $5.54 per day.

We, therefore, RECOMMEND that the District Judge to whom this action is reassigned enter a judgment in favor of plaintiff and against defendant Heritage that includes damages for loan principal under the Promissory Notes in the amount $571,544.33 and interest on that amount at the rate of $281.86 per day from August 30, 2006, through the date the Court enters judgment.

Plaintiff also seeks attorneys' fees and costs pursuant to the Promissory Notes.  We address these requests below.

### C.    Attorneys' Fees and Costs

Plaintiff seeks reimbursement of attorneys' fees and costs in the amount $34,326.50.  Lorch Decl., at ¶12; Supp. Lorch Decl., at ¶2-6 and Ex. A.[13]

The Franchise Agreements and Promissory Notes obligate Heritage to pay plaintiff's reasonable attorneys' fees and costs incurred to enforce the agreements.[14] *E.g.*, Iuliano Decl., Ex. C at ¶20 and Ex. D at 2.  Moreover, both types of documents provide for fees to the "prevailing party" where, as here, legal action is necessary to enforce the contracts.  If the District Judge adopts this court's recommendation to enter judgment in favor of plaintiff and against defendant Heritage, then plaintiff will have "prevailed" and will be entitled to reasonable attorneys' fees and costs under the governing contracts.

---

[13]Plaintiff's Application seeks attorneys' fees in the amount $27,730.00.  Lorch Decl., at ¶12.  However, when we calculate the fees charged using the billing records submitted by plaintiff the fees charged appear to total $30,599.00.  At the June 27th hearing counsel opined that the billing records might includes charges made after counsel prepared his declaration.  However, Mr. Lorch's initial declaration was filed April 18, 2007, and we see no entries in the billing records after that date.  Because we have no reason to question the accuracy of counsel's billing records, we rely on the total as obtained directly from the billing records as opposed to the total set forth in counsel's declaration (the latter could be the result of a mathematical error).
Plaintiff seeks reimbursement of costs in the amount $3,727.50.  Supp. Lorch Decl., at ¶6 and Ex. A.

[14]The Security Agreements, which we discuss *infra*, also provide for attorneys' fees and costs.

1

### 1. <u>Tasks Performed and Number of Hours Spent on Those</u>

2     <u>Tasks</u>

3          According to plaintiff's billing records, counsel spent 112.5 hours evaluating

4     the case, preparing the complaint, preparing applications for writs of attachment,

5     responding to filings by the individual defendants, obtaining default, drafting and

6     filing the instant motion, and corresponding with clients, the court and/or

7     defendants.  Supp. Lorch Decl., at ¶3 and Ex. A.

8          Because plaintiff has not obtained a judgment against the <u>individual</u>

9     defendants, it is this court's view that it would be inappropriate for plaintiff to

10    recover attorneys' fees for work related only to the <u>individual</u> defendants.  Stated

11    another way, we RECOMMEND allowing compensation only for those activities

12    that would have been reasonably necessary had Heritage been the only defendant

13    in the action.  At the June 27th hearing, we identified for counsel those billing

14    entries that appeared to encompass work pertaining to either the individual

15    defendants alone or to the corporation and individuals jointly – *e.g.*, charges with

16    respect to the guaranties, applications for prejudgment attachment, asset report,

17    bankruptcy issues, and various entries that clearly pertain only to defendants who

18    have appeared in the action.  As stated on the record, some or all of the charges for

19    these entries should be disallowed, and we invited counsel's input with respect to

20    this issue.

21          Counsel objected to the court disallowing fees with respect to two categories

22    of charges.  First, counsel stated that plaintiff received one asset report that

23    pertained to each of the defendants and, therefore, charges involving review of

24    assets apply to Heritage.  However, because the addition of information about the

25    individual defendants' assets would have increased the time taken to review and

26    analyze the report the court asked counsel to estimate that portion of the report that

27    pertained only to the corporation.  Counsel suggested that the court attribute one

28

quarter of the work pertaining to review of defendants' assets to the corporation alone because the corporation was one of four defendants. We accept this suggestion and recommend that the District Judge award fees for only 25% of the time billed for reviewing the asset report. Second, counsel objected to disallowing time spent on the applications for attachment on the ground that all of the fundamental work for these applications would have been completed even if Heritage had been the only defendant. Counsel represented that the small amount of work that pertained specifically to the individual defendants was merely ministerial. Transcript of June 27, 2007, hearing. We accept counsel's representation and do <u>not</u> recommend any reduction in plaintiff's fees for work pertaining to the applications for attachment.

We have reviewed counsel's billing records and RECOMMEND that the District Court find that, with the exception of the identified tasks that would not have been necessary had the corporation been the only defendant, the kinds of tasks performed by counsel were reasonably undertaken. We also RECOMMEND that the District Court find that counsel expended a reasonable number of hours completing those tasks.

Accordingly, we RECOMMEND that the District Court grant plaintiff's request for reimbursement of attorneys' fees in connection with evaluating the case, preparing the complaint, preparing applications for writs of attachment, obtaining default, drafting and filing the instant motion, and corresponding with clients and the court.

After reviewing plaintiff's billing records, it is our RECOMMENDATION that the District Court *dis*allow $3,821.13 of plaintiff's fee request to account for work that pertains only to the individual defendants against whom there currently is no judgment.

//

## 2.    Hourly Rates

Plaintiff states that it seeks reimbursement of its attorneys' time at the following rates: $335.00 per hour for partners and $265.00 per hour for associates. Plaintiff also seeks $150.00 per hour for a "law clerk"/paralegal.  Lorch Decl., at ¶12; Supp. Lorch Decl., at ¶5.  However, it appears from the billing records that work conducted by Mr. Lorch, a partner, actually was billed at the rate of $265.00 per hour.  Supp. Lorch Decl., at Ex. B.

We have sufficient experience with local billing rates in these kinds of cases (as well as many others) to conclude that counsel's billing rates are commensurate with the prevailing market rate in the Bay Area for lawyers of their skill and experience doing the kind of work these matters involved.  See, Supp. Lorch Decl., at ¶4 and Ex. A and B (Altman Weil survey of national billing rates).

In contrast, based on this court's experience with local billing rates, we conclude that the rate of $150.00 per hour for work by a non-attorney, work that is essentially that of a paralegal, is excessive.  We have not seen requests to compensate paralegal time over $100.00 per hour.  Accordingly, we recommend that the District Court reduce the rate at which Ms. Welke's time was billed to $100.00 per hour.

We, therefore,  RECOMMEND that the District Court approve reimbursement of plaintiff's counsel's hours at the rate of $335 per hour for Mr. Davis, $265 per hour for Mr. Lorch and Ms. Garner, and $100 per hour for Ms. Welke (formerly Ms. Murphy).  If the District Court adopts these recommendations, the Court would reduce plaintiff's attorneys' fee award by an additional $330.00.

//

//

//

### 3.    Costs

1    Plaintiff also seeks reimbursement for costs in the amount of $3,727.50.

2    Lorch Decl., at ¶12; Supp. Lorch Decl., at ¶6.  These costs were incurred for Court

3    filing fees, photocopies, service/messenger fees, and for a "private investigator's"

4    fee to conduct an asset search.  Supp. Lorch Decl., at ¶6 and Ex. B.  As discussed

5    on the record, the court RECOMMENDS disallowing those costs that pertain to the

6    individual defendants and that plaintiff would not have incurred had Heritage been

7    the only defendant in this action.

8    Plaintiff seeks reimbursement of various messenger and process server

9    charges.  See, Supp. Lorch Decl., at Ex. A (page marked "page 44").  However,

10    plaintiff could not identify which of those charges pertain to Heritage and which

11    pertain to the individual defendants.  See, Transcript, June 27, 2007, hearing.

12    Accordingly, we RECOMMEND that the District Court allow one service charge

13    to Mr. Schlendorf, Heritage's agent for service of process, for $70.00, and *dis*allow

14    the remaining charges for $486.44.[15]  We also RECOMMEND that the District

15    Court disallow the messenger service charge for $21.60 reflected in the billing

16    records at "page 34."  Plaintiff has not identified the recipient of this delivery, and

17    it inexplicably appears to reflect delivery to a real estate developer in Southern

18    California.

19    Additionally, plaintiff's costs include a charge by an investigator for

20    $2,071.05.  Supp. Lorch Decl., at Ex. A ("page 39").  This represents the

21    investigator's charge for conducting an asset search as to each of the defendants.

22    Supp. Lorch Decl., at ¶ 6.  As stated previously, we recommend that the District

23    Court allow one fourth of charges related to the asset search.  Accordingly, if the

---

[15]We do not recommend disallowing the messenger service charges found at "page 50" of plaintiff's billing records as these charges appear to reflect documents sent to the Court and to a local attorney in New Jersey where plaintiff is situated – and not to reflect charges for delivery to any of the individual defendants.

District Court adopts this recommendation, the Court will reduce plaintiff's award of costs by an additional $1,553.29 to reflect that portion of the asset search relating to the individual defendants.  With respect to the remaining $517.76 we note that charges by a private investigator do not constitute taxable costs.  Civil Local Rule 54-3.  Under most circumstances, we would proceed to determine whether this type of charge constitutes an 'out of pocket expense' normally chargeable to the client as part of the "attorney's fee." *E.g., Harris v. Marhoefer*, 24 F.3d 16 (9th Cir. 1994) (fee award under 42 U.S.C. §1988).[16]  However, in this case, pursuant to the parties' Promissory Notes, plaintiff is entitled to recover "reasonable attorney's fees...and court costs and <u>all costs of collection</u>..." *E.g.*, Iuliano Decl., at Ex. D (emphasis added).  We, therefore, RECOMMEND that the District Court find that plaintiff is entitled to recover that portion of the investigator's charges relating to Heritage as a component of damages pursuant to the parties' contract regardless of whether such charges also constitute out of pocket expenses normally borne by the client as part of the attorneys' fee.

<u>With the exceptions noted above</u>, the items for which reimbursement is sought constitute taxable costs, out-of-pocket expenses normally chargeable to the client, and/or a component of contract damages.  Civil L.R. 54-3.  *Accord*, *Harris v. Marhoefer*, 24 F.3d 16.  The amounts expended were reasonable.  We, therefore, RECOMMEND that the District Judge grant plaintiff's request for costs in the reduced amount of $1,687.77.

//

//

//

//

---

[16]We note that *Harris,* without any discussion, seems to allow a charge for an "investigator."

### 4.     Recommendation re Fees and Costs

For the reasons stated above, we recommended that the District Court reimburse plaintiff attorneys' fees in the amount $26,447.87.  We also recommend that the District Court award costs in the amount $1,687.77.

If the District Court to whom this case is reassigned adopts this Court's recommendation to enter judgment in favor of plaintiff on its claims for breach of contract, we RECOMMEND that the District Court award plaintiff attorneys' fees and costs in the total amount $28,135.64.

### D.     Enforcement of Security Agreements

Plaintiff also asks the Court to award it possession of collateral secured by the Security Agreements.  Application at 18; Supp. Brief at 7-9.

The evidence supports a finding that the parties executed seven "Security Agreements" and that each of the Promissory Notes is secured by one of the Security Agreements.  Iuliano Decl., at Ex. H, M, S, and X.  Each Security Agreement also purports to secure one of the Franchise Agreements -- more specifically, the Franchise Agreement that corresponds to the relevant promissory note(s).  *Id*.; see also, Iuliano Decl., at ¶¶14, 26, 38, and 50.

At the June 27th hearing we expressed several concerns about the Security Agreement found at Ex. S of the Iuliano Declaration.  We noted that that agreement, while signed by all the parties, (1) is undated, (2) refers to a Franchise Agreement without identifying which one by date, (3) purports to secure a "Second Expansion Promissory Note" for $60,000.00 when no document titled as such appears in evidence, and (4) purports to secure an Expansion Promissory Note for $400,000.00 when no such note appears in evidence.  We then explained that, by looking to other evidence in the record, we can adequately discern most of the parties' intentions.

First, the evidence supports an inference that the "Second Development Advance Promissory Note" found at Ex. R of the Iuliano Declaration is secured by the Security Agreement found at Ex. S. See, discussion Transcript, June 27, 2007, hearing. The amount of the non-existent "Second Expansion Promissory Note" referenced in that Security Agreement corresponds to the amount of the Second Development Advance Promissory Note found at Ex. R.

Second, although the Security Agreement does not identify the secured Franchise Agreement by a date certain, it identifies the secured Franchise Agreement by year (2001). Two Franchise Agreements in the record are dated in 2001. Iuliano Decl., at Ex. P and V. Because the Security Agreement purports to secure a Promissory Note for $200,000.00 and one for $60,000.00 we infer that the Franchise Agreement referenced is the agreement dated April 1, 2001. Iuliano Decl., at Ex. P. The evidence supports a finding that that Franchise Agreement is associated with promissory notes in those amounts. Iuliano Decl., at ¶35.[17]

In contrast, however, the evidence would not support a finding that plaintiff and defendant are parties to a promissory note in the amount $400,000.00 despite a reference to that effect in this Security Agreement. See, Transcript, June 27, 2007 hearing. No promissory note in that amount has been introduced in evidence. Plaintiff's counsel suggested that the court strike the language in the Security Agreement referring to a promissory note for $400,000.00. *Id.*; Iuliano Decl., at Ex. S. This Security Agreement, therefore, would secure only $260,000.00 worth of loans (as opposed to $660,000.00) and sums owed under the April 1, 2001, Franchise Agreement. We RECOMMEND that the District Court accept this proposal and find that the evidence in the record would support a finding that the

---

[17]As previously stated, the agreements also purport to secure 'any other agreement' between the parties. See, n. 5, *supra*. We have found some legal authority that would suggest that such a broad pronouncement could be honored in California. However, we need not reach this issue because we recommend that the District Court find that none of the specific Promissory Notes or Franchise Agreements in evidence is otherwise unsecured.

1   parties intended the Security Agreement found at Ex. S of the Iuliano Declaration
2   to secure the debts reflected in the Promissory Notes for $200,000.00 and
3   $60,000.00 and the Franchise Agreement, dated April 1, 2001.  See, Iuliano Decl.,
4   at Ex. P, Q, and R.

5       Having recommended that the District Court find that each of the
6   Promissory Notes and Franchise Agreements in evidence are the subject of one of
7   the Security Agreements, we next determine whether plaintiff has demonstrated
8   that the Security Agreements are enforceable.

9       In California parties create an enforceable security interest if they satisfy the
10  following conditions: "(1) the debtor has signed a security agreement containing a
11  description of the collateral, . . . (2) value has been given, and (3) the debtor has
12  rights in the collateral."  Cal. Comm. Code §9203(b); *New West Corp., v. Coastal*
13  *Berry Corp.*, 1 Cal.App. 4th 92 (6th Dist. 1991).  For reasons set forth below, we
14  RECOMMEND that the District Judge find that plaintiff has satisfied these
15  conditions and therefore is deemed a "secured party."

16      First, each of the Security Agreements bears the signatures of multiple
17  representatives of defendant Heritage and expresses the intention of the parties to
18  create a security interest.  Iuliano Decl., at Ex. H, M, S and X.

19      Second, a security agreement must contain a description of the collateral.
20  The description should include some "designation of the property conveyed and of
21  the place where it may be found."  *Bumb v. McIntyre*, 277 F.2d 647, 649 (9th Cir.
22  1960).  However, the description need not be specific.  All that is required is that
23  the agreement "reasonably identifies what is described."  Cal.Comm.Code
24  §9108(a).  Moreover, California courts indicate that the description may be less
25  precise when only the rights of the parties to the security agreement are at issue.

26      As against third persons the mortgage must point out the subject
        matter so that the third person may identify the property covered, by
27      the aid of such inquiries as the instrument itself suggests.  But
        between the parties it is only necessary  to identify the chattels so that
28

23

the mortgagee may say with a reasonable degree of certainty what property is subject to his lien.

*The John Breuner Co., v. King*, 9 Cal. App. 271, 273 (1st Dist. 1908) quotations omitted (emphasis added). See also, *Bumb*, 277 F.2d at 649.

Each of the Security Agreements purports to create a security interest in plaintiff's favor in:

all of the furniture, furnishings, equipment, real estate listings and listing agreements and related rights which are located at or related to the residential real estate brokerage business conducted by Debtor and including the proceeds and products therefrom and any and all substitutions, replacements, additions and accessions thereto and to CENTURY 21 Incentive Bonuses to which debtor may be entitled pursuant to any franchise agreement entered into with Secured Party, together with all such rights and property hereafter acquired by Debtor.

Iuliano Decl., at Ex. H, M, S and X. Two of the Security Agreements specifically reference each of defendant's four business addresses while the other agreements refer to defendant's real estate business generally as quoted above. See, Iuliano Decl., at Ex. H.

We RECOMMEND that the District Judge to whom this case is reassigned find that the Security Agreements contain a sufficient description of the collateral at issue. The Security Agreements identify the items of collateral by categories as is permitted by California law. Cal. Comm. Code §9108(b)(2). Additionally, although most of the agreements do not identify a specific address where that collateral may be found, the description included is adequate, as between the parties, to identify the location of the collateral. Among other things, it is not necessary that the Security Agreement itself contain all the information needed to identify the collateral. Collateral may be "reasonably identified" by looking to circumstances relating to its making, including by looking to other documents related to the parties' transaction(s). *Komas v. Future Systems, Inc.*, 71 Cal.App. 3d 809, 814-815 (1st Dist. 1977). By considering all of the documents that make up the parties' transactions together (including the two Security Agreements that

24

contain addresses and each of the Franchise Agreements) we can reasonably identify the location of the secured collateral.

Third, the evidence supports a finding that value has been given in exchange for the transferred security interest. Each of the Security Agreements secures money loaned from plaintiff to defendant Heritage.

Finally, in order for an enforceable security interest to attach the debtor must have rights in the collateral beyond "mere possession." Cal. Comm. Code §9203(b); *In re Coupon Clearing Serv., Inc., v. Clare's Food Market, Inc.*, 113 F.3d 1091, 1103 (9th Cir. 1997). As we read the parties' contracts, Heritage's debts are secured by three types of collateral: (1) furniture, furnishings, & equipment, (2) real estate listings, listing agreements and related rights (including proceeds and products therefrom), and (3) Century 21 Incentive Bonuses. Heritage also pledges "all such rights and property hereafter acquired." Thus, the parties have limited the collateral at issue to physical property "acquired" by defendant, money owed to defendant, and real estate listings, etc., in which defendant has acquired "rights." In our view, the language of the Security Agreements, reasonably read, limits the collateral to which plaintiff is entitled to that property in which defendant has acquired rights beyond mere possession. To the extent one might disagree with such a reading, we RECOMMEND that the District Judge consider expressly limiting plaintiff's right to execute on the collateral to only those items in which defendant has more than a possessory interest.

For the above reasons, we RECOMMEND that the District Judge to whom this matter is reassigned find that the Security Agreements proffered by plaintiff are enforceable and plaintiff is a secured party entitled to foreclose on the collateral described therein.

California Commercial Code §9601 provides that, after default, a secured party may "reduce a claim to judgment, foreclose, or otherwise enforce the . . .

security interest . . . by any available judicial procedure."  Additionally, pursuant to California Commercial Code §9609, following default, a secured party may "take possession of the collateral" and may do so either (1) "pursuant to judicial process" or (2) "without judicial process, if it proceeds without breach of the peace." Cal.Comm.Code §9609(a)(1) and (b)(1) and (2).

Accordingly, if the District Judge adopts our finding that plaintiff has demonstrated that it constitutes a "secured party," then plaintiff is entitled to obtain a judgment to enforce its secured interest and to take possession of the collateral.

Therefore, we further RECOMMEND that the District Judge enter a judgment for plaintiff and against defendant Heritage that permits plaintiff to take possession of the collateral secured by the Security Agreements pursuant to the procedures established by California law.

**III.    Conclusion**

The court ORDERS the Clerk of the Court to randomly reassign this action to a District Judge.

We RECOMMEND that the District Judge to whom the Clerk reassigns this matter enter judgment in plaintiff's favor and against the entity Heritage Real Estate, Inc., for royalty fees and NAF fees known at this time, stipulated damages, outstanding loan principal, attorneys' fees and costs in the total amount of $7,015,719.88 (seven million fifteen thousand seven hundred nineteen dollars and eighty eight cents).

We further RECOMMEND that the District Court enter judgment for plaintiff and against Heritage Real Estate for prejudgment interest with respect to known royalty fees, known NAF fees, and loan principal in the amount $341.23 per day from August 30, 2006, through the date of the judgment.

1       We also RECOMMEND that the District Court enter an order compelling

2   defendant Heritage to submit to an audit for the period September 1, 2004, through

3   August 29, 2006, that the Court order defendant Heritage to provide relevant

4   records requested by the auditor, and that the District Court enter an amended

5   judgment for additional amounts found owing following an audit procedure in

6   which defendant received notice of the auditor's findings and an opportunity to

7   respond within 30 days of being served by the auditor with a draft report.

8       Finally, we RECOMMEND that the District Judge find that plaintiff

9   constitutes a "secured party" and that the District Court enter a judgment

10  permitting plaintiff to take possession of the collateral secured by the Security

11  Agreements pursuant to procedures consistent with California law.

12      **The Court ORDERS plaintiff to promptly serve a copy of this Report**

13  **and Recommendation on Heritage Real Estate, Inc.**

14  IT IS SO REPORTED AND RECOMMENDED.

15

16  Dated: July 6, 2007                                        _____

17                                                  WAYNE D. BRAZIL
                                                    United States Magistrate Judge

18

19  Copies to:
    Plaintiff with instructions to serve defendant,
20  WDB, stats, Clerk.

21

22

23

24

25

26

27

28

27